417 Pa. Superior Ct. 68 (1992)
611 A.2d 1267
In re V.E. and J.E.
Superior Court of Pennsylvania.
Submitted April 20, 1992.
Filed June 30, 1992.
*71 Jay Stillman, Asst. Public Defender, Williamsport, for appellant.
Charles F. Greevy, III, Williamsport, for VE, Natural Father, participating party.
Ralph W. Thorne, Williamsport, for Lycoming County Child & Youth Services, participating party.
Before CIRILLO, MONTEMURO and HESTER, JJ.
CIRILLO, Judge:
This is an appeal from an order entered in the Court of Common Pleas of Lycoming County granting a petition to involuntarily terminate the parental rights of the natural father. The appeal is also accompanied by a petition from counsel for the father requesting permission to withdraw representation on the grounds that the appeal is frivolous. We affirm the order and grant the petition.
Appellant Victor H. Edwards, who is currently serving a twelve year and two month to twenty-five year sentence in *72 the State Correctional Institute at Frackville, is the natural father[1] of two boys, V.E., born August 2, 1982, and J.E., born October 7, 1983. On February 13, 1989, a Children and Youth Services (CYS) caseworker accompanied a Pennsylvania State Police officer to Edwards's residence in response to a report that a woman and her infant were being held there against their will. The report was accurate; the woman had been padlocked inside and Edwards controlled the key. The woman stated that Edwards escaped through a window when he saw the police officer approaching. The woman and child were taken from the residence. The police also took emergency custody of Edwards's two sons, V.E. and J.E., because the home was unsanitary, in deplorable condition, and the boys, ages six and seven, were left without supervision. Edwards telephoned CYS later that same day to inform the agency that he would be out of the state for six weeks. Edwards made no provision for the care of his sons; consequently, at the emergency hearing the children were placed with CYS. On February 28, 1989, the boys were adjudicated dependent and placed together in a foster home. On April 7, 1989, after the objectionable conditions which prompted their removal were remedied, V.E. and J.E. were returned to their father's custody. They remained with him for three months.
On July 14, 1989, CYS again took emergency custody of the boys, based on a report that Edwards was teaching V.E. how to have sexual intercourse with the five year old daughter of Edwards's live-in girlfriend. The report was determined to be "founded." After a hearing, the boys were again adjudicated dependent and placed in foster care. Over the next few days Childline, the state-wide child abuse hot-line and registry, received several more reports[2] of *73 Edwards's sexual abuse of his sons; each report was investigated and determined to be "indicated." See 23 Pa.C.S.A. §§ 6368 & 6303. Finally, in September of 1989 the parties entered into an agreement which continued the boys' dependency adjudication, approved a six month Family Service Plan, arranged for a psychological evaluation of Edwards to be performed at the prison where he was incarcerated, arranged for Edwards to have a supervised visit with his sons, and required Edwards to cooperate in any treatment prescribed by the Sexual Abuse Treatment Program.
The visit with the boys took place at the prison, but according to the caseworker present, was very strained. Edwards terminated the psychological evaluation, claiming an earache, at the first mention of his sons. The prison system had a psychological evaluation done on Edwards for its own use, but Edwards refused to consent to release of the report. Edwards never even scheduled the initial interview with the Sexual Abuse Treatment Program. The requisite disposition review hearings were held every six months; at each hearing the boys' dependent status was reaffirmed and their placement in foster care was continued. See 42 Pa.C.S.A. § 6351. Although Edwards was unable to attend the disposition review hearings due to his incarceration at Farview and various other correctional facilities, Edwards was granted the right to petition for a review hearing whenever he was able to attend. Edwards *74 exercised that right in January of 1991, and a review hearing was scheduled for March 27, 1991.
On March 12, 1991, CYS filed a petition for the involuntary termination of Edwards's parental rights pursuant to sections 2511(a)(2) and (a)(5) of the Adoption Act. See 23 Pa.C.S.A. §§ 2511(a)(2), (a)(5). The trial court conducted extensive hearings on five days in March, April and May. Edwards testified and essentially denied either physically or sexually abusing his sons; he claimed all incidents of abuse were inflicted by his live-in girlfriend. He also claimed he provided a happy and stable home life for his sons. The judge interviewed V.E. and J.E. separately in his chambers, with all counsel present. V.E. stated he had been subject to both physical and sexual abuse and had been told to have sexual intercourse with a five year old girl. J.E. reported that he saw his brother have sexual contact with the five year old girl, and that he was beaten with a belt and tied to a chair. The psychologist who has been working with the boys weekly since September of 1989, their foster mother since March of 1990, an independent psychologist who evaluated the boys, a mental health caseworker, a sexual abuse caseworker, the CYS parent-partner, and the CYS caseworker all testified about their conversations and interaction with the children.
The trial court's findings of fact, supported by competent evidence in the record, reveal the following: in addition to being subjected to various forms of sexual abuse, the boys had also witnessed their father having intercourse with, sodomizing and performing oral sex on the five year old daughter of his girlfriend, having inappropriate sexual contact with his girlfriend's young son, and engaging in sexual intercourse with his girlfriend. The boys also witnessed the young girl being sexually molested by her two young brothers. Although J.E. was a victim of less sexual abuse, both boys had been excessively hit with a belt by Edwards and his girlfriend, and had often been tied to chairs when their father worked outside. Both boys are very much afraid of their father, express hatred toward him and never want to *75 see him again. When removed from their father's home, both boys were socially and educationally delayed; at ages six and seven, neither child even knew the alphabet.
On September 18, 1991, the trial court granted CYS's petition to involuntarily terminate Edwards's parental rights. Edwards filed Exceptions to the Decree Nisi, which were denied on December 2, 1991. This timely appeal followed. Edwards now asks us to consider "[w]hether termination of parental rights was in error."
On appeal, our scope of review is limited to determining whether the decree of termination is supported by competent evidence. In re Adoption of Michael J.C., 506 Pa. 517, 521, 486 A.2d 371, 373 (1984). Absent an abuse of discretion, an error of law or insufficient evidentiary support for the findings of the trial court, we will not reverse the hearing court's involuntary termination of parental rights. In re Quick, 384 Pa.Super. 412, 559 A.2d 42 (1989). The party seeking to terminate parental rights bears the burden of proving by clear and convincing evidence the statutory grounds for doing so. Matter of Adoption of C.A.E., 516 Pa. 419, 422, 532 A.2d 802, 803 (1987).
CYS filed a petition to involuntarily terminate Edwards's parental rights pursuant to sections 2511(a)(2) and (a)(5) of the Adoption Act, which provide:
(a)(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
* * * * * *
(a)(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the *76 services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
23 Pa.C.S.A. §§ 2511(a)(2) and (a)(5).
Where, as here, the children have been removed from the parental home and placed in foster care, the parent has an affirmative duty to work towards the return of his children. In re Adoption of J.J., 511 Pa. 590, 602, 515 A.2d 883, 889 (1986). At a minimum, that "affirmative duty" requires that the parent show a willingness to cooperate with CYS to obtain the rehabilitative services necessary to enable the parent to meet the duties and obligations inherent in parenthood. Id. In a termination proceeding, the trial court must consider all the circumstances in determining whether a parent has fulfilled his obligations; the court must measure the parent's performance in light of what would be expected of any individual under similar circumstances. Matter of M.L.W., 307 Pa.Super. 29, 33-34, 452 A.2d 1021, 1023-24 (1982) (citations omitted).
When a parent is separated from his children, he not only has a duty to love, protect and support them; he also has a duty to maintain communication and association with them. Adoption of McCray, 460 Pa. 210, 216, 331 A.2d 652, 654 (1975); In re Adoption of M.J.H., 348 Pa.Super. 65, 72, 501 A.2d 648, 651 (1985). Our courts have repeatedly stated that being a parent is more than a passive state of mind; it requires constant affirmative demonstration of parental devotion. M.J.H., 348 Pa.Super. at 73, 501 A.2d at 652. "A parent must exert himself to take and maintain a place of importance in the child's life." Id. Imprisonment is but one circumstance the trial court must consider in analyzing a parent's performance, for parental responsibilities are not completely tolled during incarceration. McCray, 460 Pa. at 216-217, 331 A.2d at 655. Moreover, a parent is expected to utilize whatever resources are available to him while in prison in order to foster a continuing *77 close relationship with his children. Id. "Where the parent does not exercise reasonable firmness in `declining to yield to obstacles,' his [parental] rights may be forfeited." Id.
At the termination hearing on May 7, 1991, the following exchange occurred between Edwards and the attorney for CYS:
Q. Have you in any way communicated with your children in regards to sending them cards or letters or gifts or anything while you've been in prison?
A. It's impossible to send cards and gifts because you've got to buy the cards and gifts and I'm in a strict unit that I can't buy anything, there's no address to send these to how would I send a gift to somebody unless you know where they're living?
Q. You've been aware that they've been in the custody of [CYS], isn't that so?
A. That's right.
Q. And the visitations that you've talked about, you were aware that a psychological evaluation had to be done before you would be allowed any visitations, is not that true?
A. That's right, a guy came to the jail and I had trouble with my ear....
When asked why he refused CYS's request to release the report of the psychological evaluation performed by the prison system, Edwards responded:
To make it perfectly clear to the Court, I'm not involved with Children and Youth, I never will be and as far as I know I will not tell them my business, that is none of their business, my kids are well brought up, ...
In light of Edwards's own testimony, it is clear that Edwards has neither "exerted himself to take and maintain a place of importance" in his childrens' lives, M.J.H., supra, nor made any type of affirmative demonstration of his love or concern for his children. Id. Indeed, by refusing to cooperate with CYS in obtaining a psychological evaluation, *78 the condition precedent to visits with his sons, Edwards has failed to meet even the minimum level of his affirmative duty. J.J., supra.
In M.J.H., supra, the incarcerated father sent cards and letters to his daughter, wrote weekly letters to his family inquiring about her welfare and asking them to purchase gifts for her, and arranged with his family to bring her to the prison on their twice-monthly visits. On his daughter's visits the father would play with her, and they admittedly had a good relationship. Nonetheless, this court affirmed the termination of the father's parental rights under section 2511(a)(2) of the Adoption Act, which focuses on the needs of the child rather than the parent's willingness or capacity to parent. According to the court, "[h]is life imprisonment makes him incapable of providing [his daughter] with what she needs on a day-to-day basis, and this incapacity will not be remedied." M.J.H., 348 Pa.Super. at 80, 501 A.2d at 656.
Unlike the situation in M.J.H., supra, here Edwards has sent no cards, gifts or letters to his children. He does not know where his sons live and he has not even contacted CYS to obtain an address or telephone number. Edwards has not requested that the social workers or volunteers at the prison help him contact his children. The record clearly indicates that when V.E. and J.E. were living with their father, he repeatedly and continually abused them, physically, mentally, and sexually. His relationship with his sons is very poor; they fear him and never want to see him again. Edwards is now serving a twelve to twenty-five year term. In twelve years when he first becomes eligible for parole, V.E. will be twenty-one years old and J.E. will be nineteen years old. Applying the criteria of section 2511(a)(2) and considering all the circumstances, M.L.W., supra, we conclude that Edwards is incapable of providing his sons with what they need on a day-to-day basis, and Edwards's incapacity will not and cannot be remedied before the children reach their majority. M.J.H., supra. We decline to "preserve in law a relationship which no longer exists in fact, with the result that the child[ren are] consigned indefinitely *79 to the limbo of foster care or the impersonal care of institutions." In re William L., 477 Pa. 322, 349, 383 A.2d 1228, 1241 (1978). As we have decided this appeal on the basis of section 2511(a)(2), we need not address the same issue under section 2511(a)(5).
We hold that the trial court did not abuse its discretion or commit an error of law; the decree of termination is adequately supported by competent evidence. Quick, supra; Michael J.C., supra. CYS has met its burden and established by clear and convincing evidence every element of the grounds for involuntary termination of parental rights under section 2511(a)(2) of the Adoption Act. 23 Pa.C.S.A. § 2511(a)(2); C.A.E., supra. We, therefore, affirm the decree terminating the parental rights of Victor H. Edwards to his sons V.E. and J.E.
We must now address the petition filed by Edwards's attorney seeking our permission to withdraw representation on the grounds that Edwards's appeal is frivolous, "in accordance with Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)." In his "Anders Brief" counsel presents the following issue:
Whether an application to withdraw as counsel should be granted when counsel had diligently investigated the possible grounds of appeal and finds the appeal frivolous?
Initially, we note that Anders v. California, supra, is the seminal case in which the United States Supreme Court delineated the extent of court-appointed appellate counsel's duty to prosecute a first appeal from a criminal conviction after that attorney has conscientiously reviewed the record and determined that there is no merit to the indigent's appeal. Based as it was on the United States Constitution's sixth amendment guarantee, made obligatory on the states through the fourteenth amendment, that "the accused shall enjoy the right ... to have the assistance of counsel for his defence," the principles set forth in Anders are applicable only to criminal cases. Our supreme court adopted the Anders rule for Pennsylvania in Commonwealth v. Baker, 429 Pa. 209, 239 A.2d 201 (1968).
*80 In Anders, the Supreme Court was distressed by the situation in which "the rich man, who appeals as of right, enjoys the benefit of counsel's examination into the record, research of the law, and marshalling of arguments on his behalf, while the indigent, already burdened by a preliminary determination that his case is without merit, is forced to shift for himself." 386 U.S. at 741, 87 S.Ct. at 1398. (citation omitted). Commenting that an attorney's role as an advocate for his client requires him to support an appeal to the best of his ability, the Supreme Court then stated:
Of course, if counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. That request, however, must be accompanied by a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses: the court  not counsel  then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous.
386 U.S. at 744, 87 S.Ct. at 1400 (emphasis added). Above all, the Supreme Court stressed, the brief was to be that of an advocate, not amicus curiae. Counsel was to present arguments in support of the appeal; counsel was not to argue that the appeal was wholly frivolous. Anders, supra.
After more than a decade of experience with the Anders procedure and several opinions addressing the inadequacies of the Anders briefs being submitted, see Commonwealth v. Collier, 489 Pa. 26, 413 A.2d 680 (1980); Commonwealth v. Perry, 464 Pa. 272, 346 A.2d 554 (1975); Commonwealth v. Greer, 455 Pa. 106, 314 A.2d 513 (1974), our supreme court reevaluated the requirements. In Commonwealth v. McClendon, 495 Pa. 467, 434 A.2d 1185 (1981), our supreme court determined:
[t]he role of an advocate, insisted upon in Anders, refers to the manner in which the record was examined in an effort to uncover grounds to support the appeal. Where *81 counsel has in good faith satisfied that obligation and found the appeal to be wholly frivolous, he [or she] can do no more. We reject the view that his [or her] explanation of why there is no basis for an appeal should be interpreted as reflecting counsel's lack of concern in the client's cause.
Id., 495 Pa. at 473-474, 434 A.2d at 1188.
In In re Adoption of R.I., 455 Pa. 29, 312 A.2d 601 (1973), our supreme court noted that, in criminal cases, it is well established that an individual is entitled to be represented by counsel at any proceeding that may lead to "the deprivation of substantial rights." Id., 455 Pa. at 31, 312 A.2d at 602 (citations omitted). Stating that "the logic behind [the criminal cases] is equally applicable to a case involving an indigent parent faced with the loss of her child," id., the court held that an indigent parent who is a respondent in a proceeding for the involuntary termination of parental rights is constitutionally entitled to be represented by an attorney.[3]Id., 455 Pa. at 34-35, 312 A.2d at 603-04 (concurring opinion by Pomeroy, J.).
This court recently reiterated that constitutional rights in a termination proceeding are not derived from the sixth amendment; rather, they are derived from the due process clause of the fourteenth amendment to the United States Constitution. In re Adoption of T.M.F., 392 Pa.Super. 598, 609-610, 573 A.2d 1035, 1040-41 (1990) (en banc), allocatur denied, 527 Pa. 634, 592 A.2d 1301 (1990); In Interest of Del Signore, 249 Pa.Super. 149, 155, 375 A.2d 803, 806 (1977). However, in Pennsylvania, the right to be represented by an attorney is also embodied in the Judicial Code. See 42 Pa.C.S. § 2501.[4] In T.M.F., this court was presented *82 with the issue of how and when the ineffectiveness of counsel at an involuntary termination proceeding can be raised. The court focused on the adversarial process and the liberty interest involved in criminal cases and contrasted it with the quasi-adversarial process inherent in the principle of parens patriae. In a plurality decision, the court reasoned that in light of the constitutional and procedural differences between criminal prosecutions and termination proceedings, "any attempts to superimpose the [sixth amendment right to counsel] and its accompanying procedures to non-criminal termination cases, while superficially appropriate, is misguided." T.M.F., 392 Pa.Super. at 609, 573 A.2d at 1041. Since the procedures for raising ineffectiveness of counsel claims in criminal, civil, and paternity suits were all derived from the sixth amendment, the plurality determined that similar procedures could not be adapted to termination proceedings because no liberty interest or guaranteed right is at stake. We find that reasoning inapplicable to the issue at hand.
In William L., supra, our supreme court stated: Noting that the contours of the liberty interest guaranteed by the fourteenth amendment had never been exactly defined, the [United States Supreme] Court stated: "Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to ... marry, establish a home, and bring up children...." Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).
477 Pa. at 335, 383 A.2d at 1234. While we agree that the Commonwealth has both the right and the duty to protect its weaker members who are unable to protect themselves, id., 477 Pa. at 338, 383 A.2d at 1236, parental rights must nevertheless be accorded significant protection. Id. (citations omitted). An indigent parent faced with the permanent loss of his or her child, like the indigent defendant *83 described in Anders, is entitled to be represented by an advocate, an attorney who will support the appeal to the best of his or her ability. Anders, supra; Baker, supra.
We are aware of no case law, statute, or rule of court in the Commonwealth that authorizes the adoption of the Anders procedure for appointed counsel's withdrawal of representation in cases involving involuntary termination of parental rights. Therefore, we now hold that counsel appointed to represent an indigent parent on a first appeal from a decree involuntarily terminating his or her parental rights, may, after a conscientious and thorough review of the record, petition this court for leave to withdraw representation if he or she can find no issues of arguable merit on which to base the appeal. Given the less stringent standard of proof required and the quasi-adversarial nature of a termination proceeding in which a parent is not guaranteed the same procedural and evidentiary rights as a criminal defendant, we hold that appointed counsel seeking to withdraw representation must submit an advocate's brief, as contemplated in Anders, supra; Baker, supra.
In a criminal case the Commonwealth's evidence is vigorously tested in a true adversarial proceeding, with a demanding standard of proof, and often in front of a jury. Conversely, in an involuntary termination proceeding, the parent is never entitled to a jury and can be deprived of a substantial right  the permanent loss of a child  based on the imprecise concept of "needs and welfare of the child." Moreover, the allegations against the parent and the evidence submitted in court is often based on information from an unidentified accuser who the parent has no legal right to confront. Because of the ambiguity inherent in the "needs and welfare" standard and the subjective nature of much of the evidence presented by CYS, zealous advocacy of the parent's cause is of particular importance in an involuntary termination proceeding. As this court stated in Bartasavich v. Mitchell, 324 Pa.Super. 270, 471 A.2d 833 (1984):
"The fundamental liberty interest of natural parents in the care, custody and management of their child does not *84 evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than those resisting state intervention into ongoing family affairs."
Id., 324 Pa.Superior Ct. at 274-75, 471 A.2d at 835-836, quoting Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982). For this reason we hold that any motion to withdraw representation, submitted by appointed counsel, must be accompanied by an advocate's brief, and not the amicus curiae brief delineated in McClendon, supra.
In the case at hand we find the brief submitted woefully inadequate under any standard. Counsel's review of the record consisted of little more than a recitation of the standard of review. The sole case cited in reference to the statutory grounds for termination of parental rights did not even refer to either of the two provisions of section 2511(a) of the Adoption Act relied upon to terminate Edwards's parental rights. However, our independent review of the record indicates that, in fact, Edwards has no issues of arguable merit on which he can base an appeal. Despite the inadequacy of counsel's brief, denial of the attorney's petition to withdraw, with an order that he resubmit a proper brief, would only waste scarce judicial resources and prolong the uncertain status of V.E. and J.E. Therefore, we grant counsel's motion to withdraw representation.
Order involuntarily terminating the parental rights of Victor Edwards affirmed; motion to withdraw representation granted.
MONTEMURO, J., concurs in the result.
NOTES
[1] We note that the natural mother voluntarily relinquished her parental rights to V.E. and J.E, and a final decree to that effect was entered on March 6, 1991. Although the natural mother was married to Edwards at the time the boys were born, she subsequently divorced him.
[2] Two of the additional reports alleged that Edwards' live-in girlfriend engaged in "full sexual intercourse" as well as oral sex with each of the boys, while two of the other reports alleged that Edwards and his girlfriend engaged in sexual intercourse in front of the boys. On July 21, 1989, using a collection of anatomically correct male, female, child, and adult dolls the boys acted out what they had been subjected to and what they had witnessed. The mental health caseworker testified that upon being shown the dolls,

V.E. undressed the dolls immediately. As soon as their clothes were off he took an adult female doll and placed it on top of the male child doll. He inserted the penis into the vagina. [When asked] who the dolls were, he responded Georgeann [Edwards's live-in girlfriend] and J.E. ... using the dolls he also depicted his father and Georgeann engaged in intercourse. He portrayed every conceivable position with the adult dolls ... He also demonstrated the different male and female children dolls engaged in sex acts. [When asked] he said the dolls were J.E. and [Georgeann's 5 year old daughter].
[3] We note that while the case law of the Commonwealth requires counsel in involuntary termination proceedings, Pennsylvania statutes do not. In re Adoption of T.M.F., 392 Pa.Super. 598, 607, 573 A.2d 1035, 1039 (1990).
[4] Section 2501 provides:

(a) Civil matters. In all civil matters before any tribunal every litigant shall have a right to be heard, by himself and his counsel, or by either of them.
(b) Criminal matters. In all criminal prosecutions the accused has a right to be heard by himself and his counsel.
42 Pa.C.S. § 2501.